IN THE OREGON TAX COURT
REGULAR DIVISION
Income Tax

AT&T CORP. AND INCLUDIBLE          )
SUBSIDIARIES,                      )
                                   )
            Plaintiff,             )   **TC 4814**
        v.                         )
                                   )
DEPARTMENT OF REVENUE,             )
State of Oregon,                   )
                                   )
            Defendant.             )   **AMENDED OPINION[1]**

## I.  INTRODUCTION

This case is before the court for decision after a trial.  Plaintiff (taxpayer) and Defendant

(the department) have submitted post-trial briefs.

The case involves a claim for refund filed by taxpayer in the form of an amended return

for the years 1996 through 1999.  The original returns of taxpayer were prepared using a method

for computation of the sales or gross receipts factor that for several years had been used by

taxpayer and accepted by the department. *See* ORS 314.665 (describing the sales or gross

receipts factor).[2]  Those returns resulted in some amount of gross receipts being included in the

numerator of the Oregon sales factor.  (Compl at 6.)  Taxpayer filed amended returns showing no

amount of gross receipts being included in the numerator of the sales factor in respect of

---

[1] This amended opinion corrects typographical errors in the court's Opinion filed June 28, 2011.

[2] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to the 1995 edition.

interstate and international long distance calls.

In this litigation taxpayer has altered its position in the amended return by conceding that receipts in respect of Oregon intrastate calls are includible in the numerator of the Oregon sales factor. Taxpayer continues to assert that no amount of gross receipts from interstate and international calls should be included in such numerator. Taxpayer asserts that all receipts from such interstate and international calls should be included in the numerator of the sales factor for the state of New Jersey. (Ptf's Opening Brief at 41.)

Taxpayer confirms that it is not asking for an alternative method of apportionment under ORS 314.280. Instead it is arguing that, in respect of interstate and international calls, its amended returns properly apply the rule of ORS 314.280 and the department's rules. (Ptf's Reply Brief at 9.) Taxpayer does not challenge the constitutionality of any statute or the validity of any rule of the department. The department accepted taxpayer's returns as filed. The department takes the position that taxpayer has not demonstrated that its amended returns comply with the relevant statutes and has refused to pay the refunds claimed, in part, on such returns. (Def's Post-Trial Brief at 1.)

## II. FACTS

For decades taxpayer has provided telephone service to Oregon customers and others throughout the country. As the result of an anti-trust ruling, taxpayer divested itself of assets and companies performing local call services. (Transcript at 88.) These activities are performed by local exchange carriers (LECs). (Transcript at 96-97.) Taxpayer now provides only inter-exchange services and is known as an inter-exchange carrier. (*See e.g*, Def's Ex G at 1.) Taxpayer provides long distance and international exchange services. In this case only those long distance services that connect users in Oregon with users in some other state or nation are at

issue.  (Ptf's Opening Brief at 1.)

Although taxpayer could perhaps extend its physical network to the homes of customers, it does not do so.  Rather, interstate and international calls pass over the facilities of LECs to taxpayer's point of presence (POP) in Oregon.  (Transcript at 94.)  From that point taxpayer transmits such calls to a point of presence in another jurisdiction.  (Transcript at 93-95.)  During the years at issue, in addition to other assets, taxpayer maintained in Oregon a major piece of switching equipment used in the process of completing all types of calls.  (Transcript at 99.)  In connection with the passage of a call to or from a customer's location, taxpayer pays to the appropriate LEC an access charge. (Transcript at 632.)  That charge is determined in regulatory rate case proceedings.  There is no evidence in the record that taxpayer negotiates with any LEC as to the terms or nature of the relationship, if any, between taxpayer and the LEC.  The record indicates that it is the customer in, for example, a home that determines, through the customer's choice of LEC, which LEC is ultimately entitled to the access charge payment.

Taxpayer's entire system includes a massive number of assets and reflects a very large investment.  Expensive switches (including the one located in Oregon), wire or fiber-optic lines and satellite related assets are involved.  (Ptf's Ex 10.)  Redundant capacity is built to back up the system and permit continued service in the case of failures in portions of the system.  (Transcript at 126.)  The main coordinating function for the overall activity of taxpayer is located in the Global Network Operations Center (GNOC), a large facility located in New Jersey.  (Transcript at 130-31.)  The GNOC is an extremely expensive asset containing state of the art technology.   (Ptf's Ex 16.)

Other facts established at trial will be discussed where relevant in the Analysis portion of this opinion.

### III.  ISSUE

Has taxpayer demonstrated that, under ORS 314.665, a greater portion of its income

producing activity in respect of interstate and international telephone calls is performed in New

Jersey and not in Oregon, based on costs of performance?

### IV.  ANALYSIS

The rules for apportionment of income of a public utility such as taxpayer are the focus of

this case.  Those rules are found in ORS 314.280, which provides in relevant part:

> "(1)  If a taxpayer has income from business activity as a financial organization or
> as a public utility * * *  which is taxable both within and without this state * * *
> the determination of net income shall be based upon the business activity within
> the state, and the department shall have power to permit or require either the
> segregated method of reporting or the apportionment method of reporting, under
> rules and regulations adopted by the department, so as fairly and accurately to
> reflect the net income of the business done within the state."

Pursuant to the authority granted to it in ORS 314.280, the department has adopted rules

for apportionment.  Those rules include a rule for determination of the sales factor, the factor at

issue in this case.  OAR 150-314.665(4)[3] provides, in relevant part:

> "(1)  *In General*.  Subsection (4) of ORS 314.665 provides for the inclusion in the
> numerator of the sales factor of gross receipts *from transactions* other than sales
> of tangible personal property (including transactions with the United States
> Government); under this section gross receipts are attributed to this state if the
> *income producing activity* which gave rise to the receipts is performed wholly
> within this state.  Also, gross receipts are attributed to this state if, with respect to
> a particular item of income, the income producing activity is performed within
> and without this state but the greater proportion of the income producing activity
> is performed in this state, based on costs of performance."
>
> "(2)  *Income Producing Activity; Defined*.  The term "income producing activity"
> applies *to each separate item of income* and means the *transactions* and *activity*
> directly engaged in by the taxpayer in the regular course of its trade or business
> for the ultimate purpose of obtaining gains or profit.  *Such activity does not
> include transactions and activities performed on behalf of a taxpayer, such as*

---

[3] Unless otherwise noted, all references to the Oregon Administrative Rules (OAR) are to 1995.

*those conducted on its behalf by an independent contractor.* Accordingly, income producing activity includes but is not limited to the following:

"(a)  The rendering of personal services by employees or the utilization of tangible and intangible property by the taxpayer in performing a service.

"(b)  The sale, rental, leasing, licensing or other use of real property.

"(c)  The rental, leasing, licensing or other use of tangible personal property.

"(d)  The sale, licensing or other use of intangible personal property.

The mere holding of intangible personal property is not, of itself, an income producing activity."

"*****"

"(4)  *Costs of Performance; Defined.*  The term "costs of performance" means *direct costs* determined in a manner consistent with generally accepted accounting principles and in accordance with accepted conditions or practices in the trade or business of the taxpayer."

(Emphasis added.)  The foregoing material from the statutes and rules is the only guidance for the court in this case.  There have not been case law developments in Oregon or other states that have adopted the Uniform Division of Income for Tax Purposes Act (UDITPA) relating to the questions present in this case.

Several important issues separate the parties.  The court will address the most important of these in determining the proper outcome for this case.

A.      *The Cost Object Question*

The parties are separated as to what activity or object should be the subject of a cost of performance analysis under ORS 314.665 and the department's rules.  Taxpayer says that one may look at a level of activity below which the costs it incurs are not differentially incurred.  (Ptf's Opening Brief at 46-47.)  For taxpayer, this level is the level of products, lines or service

areas. (*Id.*) In this case the product line or services on which taxpayer focuses are the interstate or international consumer telephone voice services, the same services for business and business data transmission. The department, on the other hand, says that one must look at the individual calls to or from Oregon and seek to determine the costs of performance for these calls. (Def's Post-Trial Brief at 13.)

Taxpayer criticizes what it characterizes as the department's focus on Oregon sales. Taxpayer, and at least one of its expert witnesses, describes this as assuming the answer to the relevant question as to computation of the Oregon sales factor. (Transcript at 968). Taxpayer's criticism is essentially that in solving for Oregon sales (that is receipts), one may not start with Oregon receipts as an element of the analysis. (Ptf's Reply Brief at 3-4.)

Standing alone, and stated as taxpayer has stated the matter, taxpayer's observation appears to make sense. However, the position of taxpayer does not properly take into account that the focus of the inquiry at this point in the apportionment process, under the department's rule, is to determine the receipts *from transactions*. This rule then requires one to assign to the numerator of the Oregon sales factor only those receipts where the greatest portion of costs of performance of *the transaction* occurred in this state. A review of the relevant statutes and rules demonstrates this.

ORS 314.665 requires that the numerator of the sales factor is the "total sales of the taxpayer in this state." ORS 314.665(1). ORS 314.610(7) defines "sales" as "all gross receipts of the taxpayer not allocated under ORS 314.615 to ORS 314.645." ORS 314.665(4) directs that "sales" or "gross receipts" are in Oregon if, in cases such as this, "a greater proportion of the

income-producing activity is performed in this state than in any other state, based on costs of performance."

OAR 150-314.665(4), the validity of which is not challenged, focuses on "transactions" and "income producing activity" giving rise to any given receipt.

The court is of the opinion that the statute and rules, as well as logic, dictate that the analysis must begin with transactions that are or include "income producing activit[ies.]" The next step is to determine the gross receipt from that transaction. The final step is to determine where the direct costs of performance occurred geographically, as to the transaction or activity.[4]

The department appears to have taken a step to simplify the process--it has assumed that the only transactions to be analyzed are those involving a call originating or terminating in Oregon. (Def's Post-Trial Brief at 13-14.) If that step is taken, the analysis would then need to focus on the gross receipts from that call or those calls. But that would not be the end of the analysis. A final step is assignment of those receipts to the Oregon sales factor numerator if, but only if, a greater proportion of the costs of performance of the call transaction occurred in Oregon rather than any other state.

The department's approach of starting its analysis with Oregon calls involves a shortcut, but it is not incorrect or inconsistent with the statute. In theory one could, or would, start with all income producing transactions and activities of taxpayer, link receipts to those activities and then

---

[4] It is not easy to keep one's focus on the proper question under the statute and rule. The department's witness Michael Starkey, explaining how he understood the rule, stated he would, at the beginning of the analysis, state: "Show me the revenue that's at issue for which we're deciding on taxation." (Transcript at 717.). The proper focus is, as stated, the transactions, the revenue from which is or is not assigned to the numerator of the sales factor. The steps should be to "show me" transactions and the direct costs associated with the completion of those transactions. It is then possible to conclude whether the revenue from those transactions is to be assigned to the numerator of the sales factor for any particular state.

do the costs of performance analysis on each transaction in order to determine which state was to have the gross receipt in the numerator of its sales factor. By starting with transactions with some linkage to Oregon, the department is simply starting with a smaller census. It is not concluding that receipts from that smaller census must be assigned to the Oregon numerator. They may or may not be so assigned, depending on the direct cost analysis. In theory the department's starting point is against its interest as there could be transactions or activities without the obvious Oregon connection of an Oregon customer that are left out of the census to be analyzed. However, taxpayer can hardly complain about this potentially under-inclusive position of the department.

Taxpayer and its experts spent considerable effort establishing that the cost object identified by taxpayer is proper. The major tool used by taxpayer's witnesses is the Shared Network Allocation Model (SNAM). This model focuses on lines of business or product lines. (Ptf's Opening Brief at 14.) Taxpayer's experts then attempted to assign network costs to those lines of business. (Transcript at 164.)

The first problem with taxpayer's position is that it does not have a basis in the legal requirement that transactions be considered. Instead taxpayer focuses on entire groups or classes of transactions. Taxpayer suggests that this focus is warranted under language of the department rule that refers to "generally accepted accounting principles" and industry standards or practices, pointing out that this is the method taxpayer uses for management of its business. (Ptf's Opening Brief at 51-52.) Taxpayer's witness Robert Holleron described the model as a management tool to be used by the managers of taxpayer in the oversight of their business. (Transcript at 166.)

The court is of the opinion that the reference to "generally accepted accounting principles" and industry standards is to be applied, at most, after the transaction is identified and the process of linking costs of performance to transactions or activities has begun. Indeed, the reference in OAR 150-314.655(4)(4) to accounting principles and conditions or practices in a trade or business is only made with respect to determining what are direct costs. The text of the rule should not be read as giving taxpayer license to define the cost object as it sees fit or use an internal management tool to displace the statutory and rule focus on transactions.

The second problem with taxpayer's approach is that it is geographically agnostic. Witnesses Holleron and James Allen testified on cross-examination that the SNAM did not allocate costs to particular jurisdictions, although earlier models had done so. (Transcript at 188 (Holleran); Transcript at 386-7 (Allen).) Given that the statutory directive is to determine where activities take place, based on where costs of performance occur, the court cannot place much, if any, reliance on a model that ignores the location of costs of performance. For the reasons stated below in connection with the depreciation question, the court also cannot place reliance on the method by which taxpayer's experts attempted to geographically allocate the results they derived from the SNAM.

Taxpayer has begun its analysis with the wrong cost object, has not attempted to determine where costs of particular transactions are incurred and has relied on internal management tools for its determinations regarding tax compliance. The court cannot say that taxpayer has carried its burden of proof on the question of whether a greater portion of the income producing activity with respect to Oregon connected calls is performed in Oregon or in some other state.

These deficiencies in taxpayer's case would be sufficient to deny it the relief requested in its claim for refund. The court will, however, discuss certain other aspects of the case that, alone or in combination with the cost object issue, lead to the same conclusion.

B.    *The Direct Cost Question*

Under the unchallenged rule promulgated by the department, it is a comparison of *direct costs* that is to be made. OAR 150-314.665(4)(4). On the question of what is a direct cost, the parties are separated by a wide gulf. The department's interpretation of its own rule, supported by the testimony of its expert witnesses, is that direct costs are those that are only incurred because the revenue producing transaction or activity in question occurred. (Transcript at 663.) Stated otherwise, indirect costs would be those that would be incurred by taxpayer even if the transaction in question had not occurred. Under this "but for" approach, the department argues that the only direct costs incurred as to any given phone call are a small amount for electricity and the access charge that must be paid by taxpayer to the LEC by reason of the actions of the customer placing the interstate or international long distance call. (Def's Post-Trial Brief at 25.)

Taxpayer's witnesses took the position that the costs to be considered under the statute and rule are all costs that must be incurred to engage in the general business activity in the product lines of business that they analyzed. (Transcript at 476.) Under this approach, virtually all costs incurred by taxpayer were considered to be direct costs of the interstate and international services. These costs include the general and administrative costs for the company, the cost of redundant capacity needed to assure very high levels of reliability and other such system wide costs. (Ptf's Opening Brief at 48-51.) Taxpayer points to all such costs necessary to maintain its entire system and business functions, arguing that without incurring such costs, it

would ultimately fail in its business efforts.[5] (*Id.* at 48-49.) Indeed, taxpayer's experts would have classified as direct costs those associated with billing and accounting, but for the fact that those items are specifically excluded from such characterization by the department rule. (Transcript at 477.)

What taxpayer overlooks is that in the department's rule, the exclusion from direct costs for billing and accounting is not exclusive. Rather it is illustrative. The statement in the rule is that costs that are "not part of the income producing activity itself, *such as* accounting or billing" are not to be considered. OAR 150-314.665(4)(4) (emphasis added). The approach of taxpayer is far too broad, depending as it does on the initial position of taxpayer that the income producing activity is not a transaction but an entire line of business. However, taxpayer's position goes much farther. As its witness Robert Eiler testified, a direct cost is one without which "you don't have a company." (Transcript at 476.) That is hardly a transaction focused approach. Taxpayer has offered no other interpretation of the direct cost provision.

The approach taken by taxpayer's experts is not well grounded in the relevant rule. That rule, in discussing direct costs, does make reference to generally accepted accounting principles and "accepted conditions or practices in the trade or business of the taxpayer." OAR 150-314.665(4)(4). The court views this reference as one to a more or less objective standard or set of standards for determining direct costs. Note that even the reference to an industry is objective. The method used by taxpayer's expert was called Activity Based Costing (ABC). The department's expert on these matters testified that ABC is primarily an internally focused

---

[5] The court notes that this approach to definition of direct cost echoes the differences that separate the parties on the question of cost object. Taxpayer casts its gaze much more broadly while the department focuses on particular transactions.

process used in the management of a business and the setting of prices, but it is not a financial accounting or externally focused process. (Transcript at 663-64) The court does not view ABC as a generally accepted accounting principle or industry wide practice.

The interpretation asserted by the department has a number of points in its favor. First, it is the interpretation of the agency that promulgated the rule. Second, unlike the interpretation offered by taxpayer, it does not swallow so many costs that "direct costs" becomes virtually synonymous with "all costs." Finally, the approach that a direct cost is one occasioned only by a given transaction fits much more nicely, both with the transaction focus of the relevant rule and the word "direct."

Based as it is on an improperly broad interpretation of "direct cost," the position of taxpayer as to what costs to consider in evaluating the costs of performance must be rejected. This flaw compounds the fundamentally unsound approach taken by taxpayer in the identification of the cost object.

C.      *The Access Charge Question*

The department considers the access charges paid by taxpayer to be a direct cost of each call transaction incurred in Oregon. (Def's Post-Trial Brief at 25.) The access charges are the amounts paid by taxpayer to the LECs whose facilities permit the transfer of a call to or from the customer's home and the POP of taxpayer. (Transcript at 932.) Taxpayer does not appear to quarrel with the characterization of access charges as direct costs. Rather, taxpayer argues that the access charges cannot be considered in the cost of performance analysis because they are payments to an independent contractor. (Ptf's Opening Brief at 61-62.)

In this regard, the department's rule states:

"The term 'income producing activity' applies to each separate item of income and means the transactions and activity directly engaged in by the taxpayer in the regular course of its trade or business for the ultimate purpose of obtaining gains or profit. Such activity does not include transactions and activities performed *on behalf of a taxpayer*, such as those conducted on its behalf by an independent contractor."

OAR 150-314.655(4)(2) (emphasis added). The most important aspect of this rule is that the costs to be excluded under it are those involving an independent contractor performing services "on behalf of a taxpayer." The court is of the opinion that this phrase must be compared with the concept of "providing services or goods *to* the taxpayer." Services provided to a taxpayer are not necessarily services on behalf of a taxpayer.

An example may help. Assume that in connection with the performance of services that constitute an income producing activity, a law firm incurs costs for lodging of attorneys in the taxing state for the period of a trial. While in the state the attorneys also consume food at a restaurant. These charges may be included as specific reimbursement amounts in the bill that the law firm sends to its client. Or, they may be absorbed by the law firm in whole or in part if there is a fixed fee contract. Although the hotel and the restaurant are both independent of the law firm and have entered into contracts with the firm, the costs in question should not be excluded, under the independent contractor rule, from the direct costs incurred by the law firm for purposes of sourcing of its receipts.

The evidence in this proceeding indicates that the LEC similarly provides the use of its facilities to taxpayer at a rate set by tariff. (Ptf's Opening Brief at 59.) This is done without any direct negotiation between taxpayer and the LEC, either as to terms of service or cost. Taxpayer must pay the LEC according to a tariff approved by a government commission. (Transcript at

634.)  Under that tariff, taxpayer, and not the customer initiating the call is required to make payment.  (Transcript at 633.)  This is so, even though, as the evidence shows, neither the LEC nor taxpayer even instigates the transaction that leads to the LEC charge.  Rather, the customer is responsible for the transaction occurring, first by choosing an LEC and secondly by deciding to make an interstate or international call using the services of taxpayer.  (Transcript at 635.)  The LEC is no more performing a service *on behalf of* taxpayer than the hotel or restaurant is performing a service *on behalf of* the law firm in the example.  Both the LEC and the hotel, or restaurant, are providing a service *to* taxpayer for which taxpayer must pay in connection with a specific income producing activity.

It is not clear what the reason is for the exclusion in the department's rule for payments to independent contractors, and that exception has been taken out of the rule for years after 2008.  *See* OAR 150-314.655(4) (2009).   One of taxpayer's expert witnesses speculated that the reason for the rule was perhaps that the geographic location of activities by an independent contractor would not be easily known to a taxpayer or revenue department and would make more difficult the geographic location of direct costs.  (Transcript at 974-75.)  No such problem exists here as the precise geographic location of the LEC assets is known.  Nor is there any question as to what the LEC provided, the price charged or any other material item.  Those are all governed by the regulatory tariff covering the transactions.

Finally, the particular history of taxpayer and the LEC companies suggests that whatever is going on in that relationship, it is not a case of the LEC acting "on behalf of" taxpayer.  The 1980s-vintage antitrust decree that separated local and long distance operations of taxpayer, as well as subsequent developments in the relationship of LECs and interexchange carriers such as

taxpayer, do not suggest that LECs are performing services "on behalf of" rather than "for" taxpayer.

The LEC charges should be treated as a direct cost of the income producing activity at issue here. The failure of taxpayer's analysis to do so is yet another item rendering that analysis unreliable.

D.    *The Asset/Depreciation Question*

A major element in the model presented by taxpayer is geographic allocation of the SNAM costs assigned to interstate and international calls. As mentioned above, the SNAM does not itself take geography into account.

The methodology used by taxpayer's experts is to look at the geographical distribution of taxpayer's network assets in the United States. Approximately 1.1 percent of such assets are located in Oregon and 98.9 percent of the network assets are located outside Oregon. (Transcript at 395-96.)

Taxpayer assumes without much, if any, explanation that the asset location figures can serve as a proxy for the geographic location of other costs incurred in providing *interstate and international service*. (Transcript at 396.) At the same time, taxpayer's expert concluded, again without much, if any, explanation that 10 percent of total costs for *intrastate* services would be incurred in Oregon with 90 percent of such costs incurred elsewhere. (Transcript at 393-94.)

Taxpayer's expert had no explanation for the dramatic difference on this point other than to say, in a highly conclusory fashion, that intrastate services consumed assets differently than interstate and international services (Transcript at 1042). And yet, taxpayer's expert testimony

also led taxpayer to request a finding of fact that differentiation between domestic voice interstate and domestic voice intrastate is not made in the SNAM "because they use the same types of resources." (Ptf's Opening Brief at 30.)

The court finds the testimony of taxpayer's experts on this point to be inconsistent and highly conclusory. Without substantially more explanation, the court can place no reliance on the premises or conclusions of taxpayer in this area.[6]

It also appears that the actual allocation of overall costs was done according to depreciation ratios for assets. It is not at all clear to the court how such an approach is reasonable. Depreciation deductions may well vary dramatically based on the accounting life of an asset. A fully depreciated asset in Oregon would, as a proxy, draw no other costs of performance into Oregon, even if those costs were direct costs of performance of a call originating or terminating in Oregon.

The court cannot make sense of these positions taken by taxpayer.[7] The premise of taxpayer's overall position is that virtually all assets and activities in its business are necessary for the production of income from interstate and international calls. If that is true, it is hard to understand how costs for a call to another location in Oregon would vary dramatically from that assigned to a call originating in Oregon but terminating in a location in Idaho or Montana or even Germany. Many of the same assets, and in particular the very costly switch assets, must be

---

[6] The court also notes that in many areas the model developed by taxpayer's experts relied on data and projections from after the years in question. The department's expert established that substantial changes occurred during the years in question here, such that reliance on out of period data is not warranted. (Transcript at 737-38.)

[7] It is not clear that depreciation on assets is, in any case, a direct cost, at least under the approach the court takes as to what constitutes a direct cost. The assets in place and the depreciation on those would be incurred regardless of whether any particular call was or was not made.

available in Oregon for each such call, regardless of its ultimate destination. Taxpayer, in any case, did not adequately explain this matter.

## V. CONCLUSION

Taxpayer has not established that its determination of direct costs of the interstate and international telecommunication services is consistent with the law or supported by relevant evidence for the years in question.

The action of the department in denying to taxpayer the refund claimed by taxpayer was proper. Now, therefore,

IT IS DECIDED that the actions of Defendant in this matter were proper and are not to be disturbed.

Dated this ___ day of January, 2012.

_____
Henry C. Breithaupt
Judge

***THIS DOCUMENT WAS SIGNED BY JUDGE HENRY C. BREITHAUPT ON JANUARY 12, 2012, AND FILED THE SAME DAY. THIS IS A PUBLISHED DOCUMENT.***